FOURTH DIVISION

FILED: 9/9/99

Nos.  1-98-2881 and 1-98-2883 (consolidated)

THE TRAVELERS INSURANCE COMPANY OF ) APPEAL FROM THE

ILLINOIS and THE TRAVELERS INDEMNITY ) CIRCUIT COURT OF

COMPANY, ) COOK COUNTY

)

Plaintiffs, )

)

v. )

)

ELJER MANUFACTURING, INC., UNITED )

STATES BRASS CORPORATION, LIBERTY )

MUTUAL INSURANCE COMPANY, and HIGHLANDS )

INSURANCE COMPANY, )

)

Defendants. )

___________________________________________

)

GIBRALTAR CASUALTY COMPANY, HARTFORD )

ACCIDENT & INDEMNITY COMPANY, and )

ALLSTATE INSURANCE COMPANY, successor )

in interest to Northbrook Excess and )

Surplus Insurance Company, formerly )

known as Northbrook Insurance Company, )

pursuant to merger effective January 1, )

1985, )

)

Plaintiffs-Appellees, )

)

v. )

)

ELJER MANUFACTURING, INC. and UNITED )

STATES BRASS CORPORATION, )

)

Defendants-Appellants, )

)

and )

)

LIBERTY MUTUAL INSURANCE COMPANY and )

HIGHLANDS INSURANCE COMPANY, )

)

Defendants. )

___________________________________________

NATIONAL SURETY CORPORATION, FIRST )

STATE INSURANCE COMPANY, HARTFORD )

ACCIDENT & INDEMNITY COMPANY, and OLD )

REPUBLIC INSURANCE COMPANY, )

)

Plaintiffs-Appellees, )

)

v. )

)  

ELJER MANUFACTURING, INC. and UNITED )

STATES BRASS CORPORATION, )

)

Defendants-Appellants, )

)

and )

)

TRAVELERS CASUALTY & SURETY COMPANY, )

formerly known as Aetna Casualty & )

Surety Company; ALLSTATE INSURANCE )

COMPANY, successor in interest to )

Northbrook Excess and Surplus Insurance )

Company, formerly known as Northbrook )

Insurance Company, pursuant to merger )

effective January 1, 1985; CENTURY )

INDEMNITY COMPANY, successor to both )

CIGNA Specialty Insurance, formerly )

known as California Union Insurance )

Company, and CIC Insurance Company, )

successor to Insurance Company of North )

America; CONSTITUTION STATE INSURANCE )

COMPANY; CONTINENTAL INSURANCE COMPANY, )

successor in interest to certain )

insurance policies issued by Harbor )

Insurance Company; EMPLOYERS MUTUAL )

CASUALTY COMPANY; FEDERAL INSURANCE )

COMPANY; GRANITE STATE INSURANCE )

COMPANY; INTERNATIONAL INSURANCE )

COMPANY; LEXINGTON INSURANCE COMPANY; )

NATIONAL UNION FIRE INSURANCE COMPANY )

OF PITTSBURGH, PA.; THE NORTH RIVER )

INSURANCE COMPANY; ROYAL INSURANCE )

COMPANY; STONEWALL INSURANCE COMPANY; )

and ZURICH INTERNATIONAL, LTD., )

)

Defendants-Appellees, )

)

and )

)

HIGHLANDS INSURANCE COMPANY and )

RELIANCE INSURANCE COMPANY OF ILLINOIS, )

)

Defendants. )

___________________________________________

CENTURY INDEMNITY COMPANY, successor to )

CIGNA Specialty Insurance Company, )

formerly known as California Union )

Insurance Company, )

)

Plaintiff-Appellee, )

)

v. )

)

ELJER INDUSTRIES, INC.; ELJER )

MANUFACTURING, INC., formerly known as )

Eljer Plumbingware, Inc.; UNITED STATES )

BRASS CORPORATION; and HOUSEHOLD ) 

INTERNATIONAL, INC., ) HONORABLE

) MICHAEL B. GETTY,

Defendants-Appellants. ) JUDGE PRESIDING.

___________________________________________

PRESIDING JUSTICE HOFFMAN delivered the opinion of the court:

In these consolidated cases, Eljer Industries, Inc., Eljer Manufacturing, Inc., United States Brass Corporation, and House­hold International, Inc. appeal from orders of the circuit court of Cook County denying their motions for summary judgment and granting summary judgments determining certain insurance coverage issues in favor of: National Surety Corporation; Hartford Acci­dent & Indemnity Company; First State Insurance Company; Old Republic Insurance Company; Travelers Casualty & Surety Company, formerly known as Aetna Casualty & Surety Company; Allstate Insurance Company, successor in interest to Northbrook Excess and Surplus Insurance Company, formerly known as Northbrook Insurance Company; Century Indemnity Company, successor to CIGNA Specialty Insurance Company, formerly known as California Union Insurance Company; Constitution State Insurance Company; Continental Insurance Company, successor in interest to certain policies of insurance issued by Harbor Insurance Company; Employers Mutual Casualty Company; Federal Insurance Company; Gibraltar Casualty Company; Granite State Insurance Company; Insurance Company of North America; International Insurance Company; Lexington Insur­ance Company; National Union Fire Insurance Company of Pitts­burgh, PA.; The North River Insurance Company; Royal Insurance Company; Stonewall Insurance Company; and Zurich International, Ltd. (hereinafter collectively referred to as the "Carriers").  For the reasons which follow, we affirm in part, reverse in part, and remand this cause to the circuit court for further proceed­ings.

These appeals arise from four declaratory judgment actions filed in the circuit court to resolve insurance coverage issues spawned by continuing claims surrounding a certain polybutylene plumbing system, known as Qest Quick/Sert II (Qest System), which was manufactured and sold by United States Brass Corporation (Brass) from 1979 through 1990.  For purposes of this appeal, certain relevant facts giving rise to these consolidated actions are not in dispute.

From 1979 through 1990, hundreds of thousands of the Qest Systems were installed in homes, apartment buildings, condomini­ums, mobile homes, and manufactured housing.  These plumbing systems were almost always installed behind walls, under floors, or above ceilings.  Brass ceased to manufacture and market the Qest System for residential site-built installation on December 31, 1986, but continued to market the system for mobile homes and prefabricated housing through 1990.  As a result of certain alleged defects in the Qest System, claims have been made against Brass and its parent corporations by homeowners, homeowner associations, developers, builders, and plumbing contractors.  Based on approximately 61,300 claims received by the end of 1993, Brass estimated that approximately 4.6% of the Qest Systems installed for the period from 1979 through 1990 were the subject of claims.  According to the affidavit of one of Brass's attor­neys, the majority of the claims involve leaks in the system.  These claims generally seek recovery for: the cost of past repairs to the plumbing system, the building in which the system was installed and the building's contents; the cost of any unrepaired damage caused by the leaks; the cost of replacing the plumbing system; and the diminution in the value of the building into which the Qest system was installed resulting from the presence of the defective plumbing system.  A minority of the claims involve buildings in which the Qest System was installed but which have not yet experienced leaks (Pre-Leak Claims).  Claims within this group seek recovery for the cost of replacing the plumbing systems and the diminution in the value of the buildings into which they were installed.  All of the claimants assert that the Qest System is a defective product because it is subject to leaking well before a reasonably de­signed and installed plumbing system.  According to documents filed by Brass with the United States Bankruptcy Court for the Eastern Division of Texas, 108 lawsuits covering approximately 30,000 claims involving the Qest System remained pending as of March 31, 1994.  The affidavit of another of Brass's attorneys asserts that "liabilities, in excess of $1 billion, have been alleged against U.S. Brass as a result of the Qest Quick/Sert II plumbing system."

Eljer Industries, Inc. owns all of the stock of Eljer Manufacturing, Inc., which in turn owns all of the stock of Brass.  For a period of time relevant to this litigation, House­hold International, Inc. owned all of the stock of Brass's former parent corporation, Wallace-Murray Corporation.  For ease of analysis, we will refer to Brass, Eljer Industries, Eljer Manu­facturing and Household International, collectively, as the "Policyholders."

The Policyholders maintained multiple layers of comprehen­sive general liability (CGL) insurance.  The Carriers are insur­ance companies that issued excess CGL insurance policies, which were in effect for various annual periods from 1979 until 1990, to certain of the Policyholders.  These excess CGL policies are "form following" policies, meaning that they follow the form of the policy in the layer of coverage below them.  All of the policies issued by the Carriers provide coverage for an "occur­rence" resulting in "property damage" taking place during the respective policy period.  By reason of the provisions of the underlying policies, the Carriers' policies in effect from 1979 through 1981 (Pre-1982 Policies) define "property damage" as "injury to tangible property," and their policies in effect from 1982 through 1990 (Post-1981 Policies) define "property damage" as, 
inter
 
alia
, "physical injury to or destruction of tangible property."

The issue presented by the parties' cross-motions for summary judgment involves the question of when the coverage afforded under the Carriers' excess CGL policies is "triggered."  The circuit court determined that "property damage" for purposes of triggering coverage does not occur until a Qest System leaks, the interpretation advocated by the Carriers.  The Policyholders have appealed, contending that coverage under the policies was triggered when the system was installed.

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  735 ILCS 5/2-1005(c) (West 1996); 
Carruthers v. B.C. Christopher & Co.
, 57 Ill. 2d 376, 380, 313 N.E.2d 457 (1974).  Since the issue presented in a summary judgment proceeding is one of law, our review is 
de
 
novo
.  
In re Estate of Hoover
, 155 Ill. 2d 402, 411, 615 N.E.2d 736 (1993).  By filing cross-motions for summary judgment, the parties invite the court to decide the issues presented as questions of law.  
Allen v. Meyer
, 14 Ill. 2d 284, 292, 152 N.E.2d 576 (1958).  However, the mere filing of cross-motions for summary judgment does not require that the court grant the requested relief to one of the parties where genuine issues of fact exist precluding summary judgment in favor of either party.  
Perlman v. Time, Inc.
, 64 Ill. App. 3d 190, 380 N.E.2d 1040 (1978).

For purposes of this appeal, the parties do not contest several basic matters.  First, New York law controls the inter­pretation of the Pre-1982 Policies.  Second, Illinois law con­trols the interpretation of the Post-1981 Policies.  Third, the excess CGL policies which are the subject of this litigation provide, subject to their respective terms and conditions, excess coverage for property damage which occurs during the policy period.

The issue before us is one of contract interpretation.  Consequently, we begin with an examination of the language of the disputed policies.  As the parties agree, there must be an occurrence resulting in property damage during the policy period before coverage under any of the Carriers' policies is triggered.  Put another way, it is the property damage, not its cause, which must occur during the policy period for coverage to be triggered.  Both Illinois (see 
United States Gypsum Co. v. Admiral Insurance Co.
, 268 Ill. App. 3d 598, 644-47, 643 N.E.2d 1226 (1994)) and New York (see 
Maryland Casualty Co. v. W.R. Grace & Co.
, 23 F.3d 617, 625-26 (2d Cir. 1993)) have adopted this "injury-in-

fact" trig­ger.  The correct application of this coverage trigger necessar­ily depends upon the meaning of "prop­erty damage" as that phrase is used in the Carriers' policies.

As noted earlier, the Pre-1982 Policies define "property damage" as "injury to tangible property," and the Post-1981 Policies define "property damage" as, 
inter
 
alia
, "physical injury to or destruction of tangible property."  The Policyhold­ers argue that the very installation of the Qest System caused property damage within the meaning of the Pre-

1982 Policies under New York law and within the meaning of the Post-1981 Policies under Illinois law.  The Carriers argue that the mere inclusion of a defective component does not constitute "property damage" within the meaning of either group of policies.  In support of their respective positions, the parties have cited a large number of cases from a variety of jurisdictions, including Illinois.  However, we find the majority of these cases to be readily distinguishable and of little aid to our analysis.

The Policyholders rely heavily upon cases dealing with the installation of products containing asbestos or other toxic substances.  Both Illinois and New York recognize that the installation of products con­taining asbestos in a structure constitutes an injury to proper­ty, 
i.e.
 the structure and its contents.  See 
United States Fidelity & Guaranty Co. v. Wilkin Insulation Co.
, 144 Ill. 2d 64, 75, 578 N.E.2d 926 (1991) (hereinafter "
Wilkin
"); 
Maryland Casualty
, 23 F.3d at 627.  These cases, however, are not based upon the general proposition that the mere inclusion of a defective component constitutes an injury to property as suggested by the Policyholders.  Rather, they rest upon an acknowledgement that products containing toxic substances such as asbestos contaminate the structure into which they are incorporated and, therefore, the damage inflicted -- the contamination -- is complete upon installation.  See 
Wilkin
, 144 Ill. 2d at 75-76; 
Maryland Casu­alty
, 23 F.3d at 627.  Unlike the asbestos cases cited by the Policyholders, this case does not involve the installation of any contaminant.  The Qest System is not alleged to contain any toxic substances.  The defective nature of the system is related solely to its propensity to leak prematurely, that is, its failure to perform as intended.  Consequently, the asbestos cases relied upon by the Policyholders provide little or no guidance in the resolution of the issues presented in this case.

The parties also rely upon a number of cases where the underlying claim was for bodily injury.  Except in circumstances where the injury process continues progressively over time, occurrence policies affording coverage for bodily injury and those affording coverage for property damage are both governed by an injury-in­-fact trigger.  See 
U.S. Gypsum Co.
, 268 Ill. App. 3d at 639-647.  This circumstance notwithstanding,  bodily injury and property damage are two distinct concepts.  Our function is to determine first what constitutes property damage within the meaning of the policies at issue.  It is only from this initial  determination that we can proceed to resolve the question of when such damage occurs for purposes of triggering coverage.  Since the parties seem to agree that both Illinois and New York apply an injury­-in-fact trigger for pur­poses of coverage, many of the bodily injury cases cited in the parties' briefs are of little assis­tance.  In the main, these cases address the ques­tion of when bodily injury is said to occur for purposes of triggering coverage, but they do not resolve the question of what is meant by either an "injury to tangible property" or "physical injury to *** tangible property."

For these reasons, we do not feel compelled to further discuss or distinguish the asbestos related cases cited by the parties or those cases addressing the issue of when bodily injury is said to occur for purposes of triggering coverage.  Instead, we will focus our attention on those cases which address the meaning of property damage as defined in a CGL insurance policy and the question of whether the installation of a defective component, other than a contaminant, falls within that defini­tion.

The trial court correctly found that New York applies an injury-in-

fact trigger.  That finding, however, does not, of itself, support the court's ultimate conclusion that coverage under the Pre-1982 policies is not triggered until a Qest System develops a leak.  Eliminating from our consideration those cases decided under New York law which stand for the proposition that the installation of products containing asbestos constitutes an "injury to tangible property," our research reveals that the New York Court of Appeals, that state's highest judicial tribunal, has indeed found that the very installation of a defective component, other than a contaminant, can constitute property damage.  In  
Sturges Manufacturing Co. v. Utica Mutual Insurance Co.
, 37 N.Y.2d 69, 332 N.E.2d 319 (1975), the New York Court of Appeals was called upon to interpret an occurrence-based CGL insurance policy that defined property damage as "injury to *** tangible proper­ty" in the context of a declaratory judgment action involving a question of coverage (duty to defend) for claims made by reason of the incorporation of defective straps supplied by the insured into ski bindings.  The thrust of the underlying claims was that the insured's straps, as a defective component of the bindings into which they were incorporated, diminished the value of, and caused consequential harm to, the bindings as a whole.  The 
Sturges
 court held that the incorpora­tion of a defective compo­nent into a larger entity inflicts property damage upon the larger entity to the extent that the market value of the larger entity is reduced in excess of the value of the defective compo­nent.  
Sturges
, 332 N.E.2d at 321-22.  We have not found, nor have the Carriers cited, any case decided by the New York Court of Appeals which overrules or retreats from the holding in 
Sturges
.  In point of fact, this court in 
Pittway Corp. v. American Motor­ists Insurance Co.
, 56 Ill. App. 3d 338, 342, 370 N.E.2d 1271 (1977), citing to 
Sturges
, found that, in interpreting CGL policies which defined property damage as "injury to tangible property," the majority of juris­

dictions hold that "property damage" includes tangible property which has been diminished in value by reason of the incorporation of a defective component.

In this case, many of the claims against the Policyholders assert a diminution in the value of the buildings into which the Qest System was installed.  Nothing in the record would permit us to conclude, as a matter of law, that this alleged diminution in value was less than the value of the Qest System itself.  Conse­quently, we believe that the trial court erred in its application of New York law to the Pre-1982 Policies when it held that coverage could not be triggered until the Qest System developed a leak.  We are not, however, prepared to find that the trial court erred in denying the Policyholders' motion for summary judgment on this same issue.

In their motion for summary judgment relating to the Pre-1982 Policies, the Policyholders asked the court to find, as a matter of law, that "property damage" occurred upon the installation of a Qest System, and therefore, the Pre-1982 Policies in effect at the time of installation "must provide coverage" for claims relating to the system.  The flaw in the Policyholders' motion in this regard is twofold.  First, there is nothing in the record which would support the conclusion that the diminution in value alleged by reason of the installation of a Qest System is necessarily more than the value of the system itself.  Second, to the extent that the Policyholders are asking for a declaration of a duty to indemnify, the relief they seek is premature, pending resolution of the underlying claims.  No doubt, the Policyholders might be entitled to a declaration on the duty to defend issue, but that question is appropriately taken up by the trial court on remand after it addresses certain of the Carriers' arguments relating to the applicability of exclusions contained in their policies.

We conclude, therefore, that the trial court erred in entering summary judgment for certain of the Carriers on the issue of when coverage is triggered under the Pre-1982 Policies, but we affirm the denial of the Policyholders' motion for summary judgment for the reasons stated in the preceding paragraph.

Unlike the New York Court of Appeals, the Illinois Supreme Court has not had an occasion to address the question of whether the mere installation of a defective product other than a con­taminant is considered property damage within the meaning of a CGL insurance policy.  In support of their argument that the installation of a Qest System is "property damage" within the meaning of the Post-1981 Policies under Illinois law, the Poli­cyholders rely primarily upon the majority opinion in 
Eljer Manufac­turing, Inc. v. Liberty Mutual Insurance Co.
, 972 F.2d 805 (7th Cir. 1992) (hereinafter "
Eljer
").  However, for reasons which we will articulate further on in our opinion, we decline to embrace either 
Eljer's
 holding in this regard or the construction methodology employed by its majority.

As we have said, the interpretation of any insurance policy necessarily begins with the language of the policy itself.  In construing the policy, we are required to give meaning to each term used unless to do so would render the clause or policy inconsistent or contradictory.  
Out­board Marine Corp. v. Liberty Mutual Insurance Co.
, 154 Ill. 2d 90, 123, 607 N.E.2d 1204 (1992).  If the words in the policy are unambiguous, they must be afforded their plain, ordinary, and popular meaning.  
Outboard Marine Corp.
, 154 Ill. 2d at 108.

The Post-1981 Policies at issue define "property damage" as "
physical
 injury to *** tangible property." (Emphasis added.) We find nothing ambiguous about this definition.  For coverage to be triggered, there must be an injury to tangible property and that injury must be a physical one.  The addition of the word "physi­cal" to the definition distinguishes the Post-1981 Policies from the Pre-1982 Policies and other similar CGL policies which define "property damage" merely as an "injury to tangible prop­erty."  As we explained in 
Diamond State Insur­ance Co. v. Chester-Jensen Co., Inc.
, 243 Ill. App. 3d 471, 611 N.E.2d 1083 (1993) (hereinafter "
Diamond State
"), intangible damage, such as diminution in value resulting from the failure of a component to perform as promised, is not a 
physical
 injury.  Although diminution in the value of the whole by reason of the incorpora­tion of a defective component may be said to constitute an injury to tangible property (see 
Pittway Corp.
, 56 Ill. App. 3d at 342), the injury is not a physical one.  See 
Diamond State
, 243 Ill. App. 3d at 478-83.  Consistent with our holding in 
Diamond State
, courts in a number of other jurisdictions have also concluded that diminution in value is not a 
physical
 injury to tangible property.  See 
Wyoming Sawmills, Inc. v. Transporta­tion Insurance Co.
, 282 Or. 401, 578 P.2d 1253 (1978); 
American Home Assur­ance Co. v. Libbey-Owens-Ford Co.
, 786 F.2d 22 (1st Cir. 1986); 
Kartridg Pak Co. v. Travelers Indemnity Co.
, 425 N.W.2d 687 (Iowa App. 1988).  Particularly supportive of our conclusion in this regard is the holding in 
Federated Mutual Insurance Co. v. Concrete Units, Inc.
, 363 N.W.2d 751 (Minn. 1985).  In that case, the Minnesota Supreme Court explained that its prior decision in 
Hauenstein v. St. Paul-Mercury Indem. Co.
, 242 Minn. 354, 65 N.W.2d 122 (1954), which held that the incor­poration of a defec­tive component could constitute an injury to tangible property, cannot be applied to cases involving CGL policies which define property damage as 
physical
 damage to tangible property.  
Feder­ated Mutual Insurance
, 363 N.W.2d at 756.

The only Illinois case which holds that the mere incorpora­tion of a non-toxic defective component constitutes property damage within the meaning of a CGL insurance policy defining property damage as a 
physical
 injury to tangible property is 
Marathon Plastics, Inc. v. Inter­national Insurance Co.
, 161 Ill. App. 3d 452, 514 N.E.2d 479 (1987).  However, in 
Diamond State
, 243 Ill. App. 3d at 482-83, we found the holding in 
Marathon Plastics
 to be inconsistent with the clear language and underly­

ing purpose of a CGL policy containing such a definition of property damage, and declined to follow it.  We reaffirm our conclusion in 
Diamond State
 on this point, and again decline to follow 
Marathon Plastics
.

In the context of a declaratory judgment action involving insurance coverage for claims made by reason of the failure of the Qest System at issue in this case, the 
Eljer
 court undertook to interpret the same definition of property damage that appears in the Post-1981 policies; namely, "physical injury to *** tangible property."  After noting a perceived conflict between "the connotations of the term 'physical injury' and the objective of [CGL] insurance" (
Eljer
, 972 F.3d at 808) and rejecting the notion that words or phrases used in insur­ance policies are always to be inter­preted in their ordinary­-language sense, the 
Eljer
 majority construed the phrase "physical injury" to include the installation of a Qest System because its expected failure rate is sufficiently high that a rational owner would be induced to replace it before it fails.  In arriving at its construction of the phrase "physi­cal injury," the majority relied almost exclusively upon its determination of the function that the phrase was intended to perform in a CGL policy.  See 
Eljer
, 972 F.3d at 806-14.  Howev­er, as the dissenting judge in 
Eljer
 points out:

"The majority believes that interpreting the phrase is all a matter of emphasis --'
physical
 injury' versus 'physical 
injury
.'  In my view, the phrase must be interpreted as '
physical
 
injury
,' with both words given effect.  The majority's account cannot give both words  meaning at the same time."  
Eljer
, 972 F.2d at 814 (Cudahy, J., dissenting).

In interpreting the meaning of "physical injury," the majority in 
Eljer
 ignored the plain meaning of the phrase and adopted a construction which, as the dissenting judge points out, fails to give effect to both words at the same time.  Addition­ally, the majority also relied upon the holding in 
Marathon Plastics
 (see 
Eljer
, 972 F.3d at 813), which we have now twice refused to follow.  Consequently, we decline to follow 
Eljer
, and will proceed to interpret the Post-1981 Policies independently of the rationale employed by that court's majority.

The word "physical" modifies injury in the definition of property damage as contained in the Post-1981 Policies and, thus, restricts recovery for intangible losses.  Under the plain and unambiguous language of these policies, some physical injury to tangible property must be shown in order to trigger coverage.  Purely economic losses, such as damages for inadequate value, costs of repair or replacement, and diminution in value (see 
Moorman Manufacturing Co. v. National Tank Co.
, 91 Ill. 2d 69, 82, 435 N.E.2d 443 (1982)), resulting from a product's inferior quality or its failure to perform for the general purposes for which it was manufactured and sold, do not trigger coverage under the Post-1981 Policies absent physical injury to tangible property.  
Diamond State
, 243 Ill. App. 3d at 479-80; see also 
Bituminous Casualty Corp.v. Gust K. Newberg Construction Co.
, 218 Ill. App. 3d 956, 963-64, 578 N.E.2d 1003 (1991).

Nothing in the evidentiary material submitted to the trial court even suggests that any physical injury was caused to a structure or a mobile home at the time that a Qest System was installed.  To the contrary, the only reasonable inference to be drawn from the parties' submissions is that a Qest System func­tions upon installation but is prone to developing leaks prema­turely due to a progressive process of deterioration.  Absent any claim of physical injury at time of installation, we reject the Policyholders' contention that coverage under the Post-1981 Policies was triggered upon installation of a Qest System.  Nevertheless, we must still address another argument made by the Policyholders in support of their contention that installation of a Qest System triggers coverage under the Post-1981 Policies.

The Policyholders correctly state that the liability of an excess insurer issuing a form following policy is determined by reference to the underlying policy.  From this proposition, they argue that, since the 
Eljer
 court determined that the installation of a Qest System triggers coverage under Post-1981 Policies issued by Liberty Mutual Insurance Company and Travelers Indemnity Company of Illinois, the form following excess CGL policies, the underlying policies for which were those issued by Liberty Mutual and Travelers Indemnity, are also triggered by installation.  We disagree.  Regrettably, it is not uncommon for the same language in insurance contracts to be interpreted inconsistently among the various juris­dictions that are called upon to construe it.  See 
United States Gypsum Co.
, 268 Ill. App. 3d at 639-47.  However, our function is to interpret the Post-1981 Policies according to Illinois law, and absent the application of the doctrines of 
res
 
judicata
 or collateral estoppel, we find no basis upon which to bind the excess carriers to an interpretation of an underlying policy made in an action to which they were not parties or in privity with a party.

Based on our rejection of the Policyholders' contention that coverage under the Post-1981 Policies was triggered upon instal­lation of a Qest System, we affirm the trial court's denial of their motion for summary judgment on this issue.  We must still address, however, the question of whether the trial court correctly concluded that coverage under these policies is not triggered until such a system leaks.

There is little doubt that a leak in a Qest System can cause physical injury to tangible property.  However, the claims against the Policyholders are not limited to circumstances where a Qest System has developed a leak.  As we stated earlier, the Pre-Leak Claims seek recovery for both diminution of the value of the structures into which Qest Systems were installed and the cost of replacing those systems.  Having already determined that the mere installation of a Qest System does not trigger coverage under the Post-1981 Policies and that diminution in value is not a physical injury to tangible property, we focus our attention on the question of whether the damages sought in the Pre-Leak Claims for the cost of replacing the systems include damages which were the result of a physical injury.

In 
Diamond State
, we held that the cost of replacing an insured's allegedly defective component part is not considered to be "property damage" under a CGL policy defining that phrase as "physical injury to *** tangible property."  
Diamond State
, 243 Ill. App. 3d at 479-80.  That holding, however, was not made in a factual vacuum.  As the opinion in 
Diamond State
 points out, "[a]lthough the allegations with respect to repair could be consistent with physical injury to other portions of the system aside from the thermal banks themselves, they cannot by them­selves denote that any such physical damage took place".  
Diamond State
, 243 Ill. App. 3d at 480.  The 
Diamond State
 court did not expand on that statement but did take pains to distinguish the facts before it from those present in 
Elco Industries, Inc. v. Liberty Mutual Insurance Co.
, 90 Ill. App. 3d 1106, 414 N.E.2d 41 (1980).

In 
Elco Industries
, the insured, Elco, supplied defective governor regulating pins which were installed in engines produced by Kohler Company.  As a result, Kohler was required to remove and replace or repair the defective pins in approximately 10,000 of its engines.  Since a governor regulating pin is the first part inserted in an engine, replacement required the complete disas­sembly and reassembly of the engines.  In the process, five to eight gaskets per engine had to be scrapped.  Even after Kohler developed a method of repairing the defective pins while they remained in the engines, one welsh plug per engine had to be scrapped as a consequence of the repair process.  Kohler sued Elco for the damages it sustained as a result of Elco's failure to supply properly heat treated and case hardened pins.  Elco was insured under a CGL insurance policy issued by Liberty Mutual Insurance Co. and brought a declaratory judgment action against Liberty seeking a determination of coverage under its policy for the suit initiated by Kohler.  
Elco Industries
, 90 Ill. App. 3d at 1108.  The court found that, "[w]hile the installation of the defective pins did not, in itself, cause actual physical damage to the Kohler engine, correction necessarily resulted in damage to several components of the finished product."  
Elco Industries
, 90 Ill. App. 3d at 1111.  According to the court, "the incorpo­ra­tion and subsequent removal of the *** pins caused, at minimum, actual physical damage to gaskets and plugs contained in the *** engines *** [;]" that is, "the replacement process damaged certain portions of the finished product."  
Elco Industries
, 90 Ill. App. 3d at 1112.  As a consequence, the court held that Liberty's policy provided coverage for the cost of the gaskets and welsh plugs which were destroyed and replaced in the process of removal and repair, along with such labor expenses as might be attribut­able to the disassembly, reassembly, removal, or replacement of parts of Kohler's engines other than the Elco pins.  No recovery was allowed, however, for the value of the defective pins, or the cost of new pins. 
Elco Industries
, 90 Ill. App. 3d at 1112-13.

Nothing in the record before us suggests that the mere installation of a Qest System caused physical injury to the structure or mobile home into which it was incorporated, but there is evidence that the replacement of the system requires that walls, floors, and ceilings be torn out.  Just as in 
Elco Industries
, the replacement process necessitates actual physical damage to tangible property other than the Qest System itself.  The damage caused to walls, floors, and ceilings in the replace­ment of a Qest System distinguishes this case from the facts present in 
Diamond State
.

In their respective motions for summary judgment, the parties have taken extremely divergent positions.  The Policyhold­ers claim that coverage under the Post-1981 Policies is triggered by the very installation of a Qest System, while the Carriers contend that coverage  is not triggered until the system leaks.  We believe that coverage under the Post-1981 Policies, although not triggered by the mere installa­tion of a Qest System, can be triggered prior to the development of a leak if the replacement of the system necessitates actual physical damage to tangible property other than the Qest System itself.  Because Illinois applies an injury-in-fact rule to determine when coverage is triggered, actual physical injury to tangible property other than the Qest System itself is a neces­sary predicate to coverage under the Post-1981 Policies.

Although the record before us does not contain copies of all of the Pre-Leak Claims, it is clear that these claims seek, in part, recovery for the cost of replacement of the Qest Systems involved.  Viewing the evidentiary material of record in its light most favorable to the Policyholders, as we must for purposes of the Carriers' motions for summary judgment (
Kolakowski v. Voris
, 83 Ill. 2d 388, 398, 415 N.E.2d 397 (1980)), we infer that the replacement process necessitates physical damage to walls, floors, and ceilings.   The actual physical injury to tangible property during the replacement process in pre-leak claims can trigger coverage under the Post-1981 Policies for the costs incurred by those claimants in tearing out and replacing walls, floors, and ceilings, but not for costs incurred in removing and replac­ing the Qest Systems themselves.  See 
Elco Industries
, 90 Ill. App. 3d at 1112-13; 
Wyoming Sawmills
, 578 P.2d at 1256-57.  Accordingly, we find that the trial court erred in granting summary judgment in favor of the Carriers based on its finding that coverage under the Post-1981 Policies is not triggered until a Qest System develops a leak and reverse the summary judgments entered in favor of the Carriers who issued the Post-1981 Policies.

So that our opinion is not misconstrued, we wish to make clear that we do not hold that any of the Carriers are obligated to indemnify the Policyholders.  Such a finding would be prema­ture pending resolution of the underlying claims.  
Outboard Marine Corp.
, 154 Ill. 2d at 127-28.  Nor have we ruled on the question of whether any of the exclusions contained in the Carriers' policies would negate coverage, as that issue was not presented to the trial court in the summary judgment motions which gave rise to this appeal.  We hold only, for the reasons already stated, that the trial court was correct in denying the Policyholders' motion for summary judgment and erred in granting summary judgment in favor of any of the Carriers.

Affirmed in part and reversed in part; cause remanded.

WOLFSON and HALL, JJ., concur.