GEORGE, C. J., Concurring and Dissenting.
Other courts faced with the question we address today have asked: Why should a homeowner have to wait for a personal tragedy to occur in order to recover damages to repair known serious building code safety defects caused by negligent construction? (E.g., Council of Co-Owners v. Whiting-Turner (1986) 308 Md. 18 [517 A.2d 336, 345].) Perhaps because those courts have addressed the matter from such a commonsense perspective, they have reached conclusions very different from that adopted by the majority in the present case. In determining that a negligently constructed home must first collapse or be gutted by fire before a homeowner may sue in tort to collect costs necessary to repair negligently constructed shear walls or fire walls, the majority today embraces a ruling that offends both established common law and basic common sense.
In this case, we must decide whether, under California law, when a building contractor has breached its duty of care by constructing a home that violates significant building safety code provisions that are designed to protect health and safety, and the homeowner has discovered these safety code violations before a personal injury has occurred or before the home has suffered any physical property damage, the homeowner, in a negligence action, may recover those costs of repair that a reasonably prudent homeowner would incur under the circumstances, or whether the “economic loss” rule of Seely v. White Motor Co. (1965) 63 Cal.2d 9 [45 Cal.Rptr. 17, 403 P.2d 145] (,Seely)—a rule designed to limit recovery of such business-related losses as lost profits or lost commercial opportunities—bars a homeowner from recovering such repair costs in a negligence action.
I agree with the majority that many if not most of the defects listed in the underlying complaints—items such as “discolored drain stoppers, and inoperable garbage disposals” (maj. opn., ante, at p. 647)—do not pose a risk of *654 personal injury or property damage sufficient to warrant recognition of a right to recover repair costs in negligence, and hence to this extent I concur in the judgment. At the same time, however, I conclude, consistent with California authority and with the courts of other jurisdictions, that a homeowner may maintain a cause of action in negligence to recover the costs of correcting the most significant building safety code violations conceded in this litigation (e.g., shear walls that were improperly constructed or fastened and that put the structure at risk of collapse during high winds or an earthquake; improperly constructed fire walls that would allow a fire to spread rapidly from one part of the structure to another), but that have not yet manifested themselves in physical damage to the property or resulted in personal injury. To the extent the majority bars such recovery, I dissent. Recognizing a right to recover costs to repair the serious safety defects here at issue—defects that pose a risk of serious personal injury or considerable property damage—would not require us to break new ground; all of the established factors traditionally used to assess building defect cases militate strongly in favor of such relief. And allowing such limited recovery also best comports with rational economic policy, as well as common sense: It obviously is preferable to pay a relatively few dollars at an early date to correct a serious safety risk that may cost millions or billions of dollars to redress if the inhabitants of dwellings are forced to wait for disaster to strike and for death, personal injury, or physical property damage to ensue.
I.
A.
In Connor v. Great Western Sav. & Loan Assn. (1968) 69 Cal.2d 850 [73 Cal.Rptr. 369, 447 P.2d 609, 39 A.L.R.3d 224] (Connor), Chief Justice Roger Traynor, upholding a negligence action by homeowners against a lending institution that had financially backed and extensively controlled a new housing development, observed that “the usual buyer of a home is ill-equipped with experience or financial means to discern . . . structural defects.” (Id., at p. 867.) The Connor opinion rejected as “conjectural claims” assertions that recognizing a duty on the part of the defendant to the homeowners would “increase housing costs, drive marginal builders out of business, and decrease total housing at a time of great need” (ibid.), observing that “[i]n any event, there is no enduring social utility in fostering the construction of seriously defective homes. If reliable construction is the norm, the recognition of a duty on the part of tract financiers to home buyers should not materially increase the cost of housing or drive small builders out of business.” (Id., at pp. 867-868, fn. omitted.) Finally, the court observed in Connor that “a home is not only a major investment for the usual buyer but *655 also the only shelter he has. Hence it becomes doubly important to protect him against structural defects that could prove beyond his capacity to remedy.” (Id., at p. 867, italics added.)
As implied in the above italicized observation, tort law offers the most effective, and often the only realistic, nonstatutory remedy for consumers in this area. Although technically available to at least some of the plaintiffs in this and similar litigation, contract or warranty claims in this setting are difficult to prove and to enforce, and our decisions have recognized that problems with privity, disclaimers inserted into contracts by developers or contractors, and notice requirements, often frustrate the ability to recover on contract or warranty theories. (See, e.g., Greenman v. Yuba Power Products, Inc. (1963) 59 Cal.2d 57, 61 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049] [notice requirement under implied warranty is a “ ‘booby-trap for the unwary’ ” and “ ‘consumers are] seldom “steeped in the business practice which justifies the rule” ’ ”]; Anthony v. Kelsey-Hayes Co. (1972) 25 Cal.App.3d 442, 448 [102 Cal.Rptr. 113] [lack of privity defeats implied warranty claim].) As observed in Kriegler v. Eichler Homes, Inc. (1969) 269 Cal.App.2d 224, 228 [74 Cal.Rptr. 749] (Kriegler), because the purchaser of a “ ‘development house’ ” “ ‘has no real competency to inspect on his own, his actual examination is, in the nature of things, largely superficial, and his opportunity for obtaining meaningful protective changes in the conveyancing documents prepared by the builder vendor is negligible. . . .’ [^] ‘Buyers of mass produced development homes are not on an equal footing with the builder vendors and are no more able to protect themselves in the deed than are automobile purchasers in a position to protect themselves in the bill of sale.’ ” Accordingly, as Chief Justice Traynor recognized in Connor, supra, 69 Cal.2d 850, the inadequacy of contract and warranty law properly should inform our consideration of the role and use of tort law in this context. (Cf. Kaiser Steel Corp. v. Westinghouse Elec. Corp. (1976) 55 Cal.App.3d 737, 747-748 [127 Cal.Rptr. 838].)
B.
As the majority observes, the author of Connor’s rousing confirmation of the right of homeowners to sue in negligence in order to remedy negligent construction also authored the majority opinion in Seely, supra, 63 Cal.2d 9—a decision that concerned not an action in negligence for repair of serious construction defects in residential housing, but, instead, an action under warranty and strict products liability for lost business profits arising from an assertedly defective commercial truck. The majority asserts that dictum in Seely, to the effect that “[ejven in actions for negligence, a manufacturer’s liability is limited to damages for physical injuries and there is no recovery for *656 economic loss alone” (id., at p. 18, italics added), supports a conclusion that there can be no recovery in negligence for any of the repair or correction costs here at issue. I disagree with the majority’s broad reading of the Seely dictum, and I agree with plaintiffs that Seely’s dictum should not be extended to bar recovery in negligence for costs to correct serious safety violations in the construction of dwellings that pose a significant risk of personal injury or property damage. Because the majority relies heavily upon a broad reading of Seely’s dictum, and because I believe that reliance is misplaced, I review the decision in Seely in some detail.
In Seely, supra, 63 Cal.2d 9, the plaintiff sued the manufacturer in both warranty and strict liability after his truck, which he used in his commercial hauling business, was involved in an accident and needed to be repaired. Previously, the plaintiff had become dissatisfied with the truck; he informed the manufacturer that it was “galloping” (bouncing violently) and was difficult to handle. (Id., at p. 12.) He used the truck in his business for approximately 11 months, during which time the manufacturer tried unsuccessfully on many occasions to correct the galloping problem to the plaintiff’s satisfaction. During this period, the plaintiff paid off approximately half of the purchase price. Then one day, rounding a comer, the brakes failed and the truck overturned. The plaintiff was convinced that the accident was caused by the defective condition of the truck, and he also was dissatisfied with the overall performance of the truck, even before the accident. He had the truck repaired, ceased making payments, and sued for “(1) damages, related to the accident, for the repair of the truck, and (2) damages, unrelated to the accident, for the money he had paid on the purchase price and for the profits lost in his business because he was unable to make normal use of the truck.” (Id., at p. 13.) The trial court found that the plaintiff had not proved that the galloping had caused the accident, and hence declined to award damages for repair costs. (Ibid.) The trial court did, however, award the other damages on the plaintiff’s warranty cause of action. (Ibid.)
In Seely, supra, 63 Cal.2d 9, this court approved the award of those damages, based upon the plaintiff’s warranty theory. Then, in dictum, we also addressed the plaintiffs’ strict liability claim. At this point in the analysis, we considered the damages described in item (2) above, finding them not allowable under strict liability theory. First, we noted concern about the prospect of permitting “unknown and unlimited” liability for such “commercial losses.” (Id., at p. 17.) In this regard, we stated that a consumer (i.e., the plaintiff) is “fairly charged with the risk that the product will not match his economic expectations unless the manufacturer agrees that it will.” (Id., at p. 18.) The court then stated, in dictum within dictum that has been repeated in subsequent cases and is heavily relied upon by the majority:
*657 “Even in actions for negligence, a manufacturer’s liability is limited to damages for physical injuries and there is no recovery for economic loss alone.” {Ibid., italics added.)
Clearly, this dictum in Seely, supra, 63 Cal.2d 9, was directed toward the issue presented in Seely—the recovery of lost profits and related liability for commercial expectation damages. The majority, however, reads Seely’s dictum much more broadly, as precluding recovery in either negligence or strict liability for the cost of repairing serious and potentially life-threatening defects reflecting building safety code violations in residential housing. I find no such suggestion in Seely. Although the court felt it important to explain that a manufacturer should not be liable in tort for commercial losses caused by the failure of a product to meet the specific needs of a purchaser’s business {id., at p. 17), it did not assert, expressly or by implication, that there could be no damages in negligence for correction of serious safety violations in residential housing that pose a danger of personal injury or serious property damage. Such a conclusion, of course, would be quite at odds with the tenor of Chief Justice Traynor’s above quoted observations in Connor, supra, 69 Cal.2d at pages 867-868, rendered just a few years thereafter.
Recognition of a homeowner’s ability to recover repair costs necessary to remedy serious safety defects in residential housing would not substantially implicate Seely’s concerns about “unknown and unlimited” liability for “commercial losses.” (Seely, supra, 63 Cal.2d at p. 17.) As plaintiffs note in their joint opening brief, “[rjecovery of costs of repair in negligence is adequately limited. Code violations or other negligent construction must be proven. Causation must be proven. Costs of repair are limited in amount, even if expert opinions may vary as to exact amounts. The number of claimants is limited to the number of homes sold. These factors distinguish recovery of such costs from the ‘economic loss’ cases in which concern was expressed about potentially limitless claims by potentially limitless claimants.”
In short, Seely’s cautions against allowing recovery of commercial expectation damages for lost profits do not justify barring recovery of the cost of repairing serious construction defects involving dwelling code violations that pose a threat to life and property. Accordingly, I find the majority unpersuasive to the extent that it relies on a broad interpretation of the Seely dictum.
C.
The understanding of the limited reach of Seely, supra, 63 Cal.2d 9, set forth above is confirmed by numerous decisions described below, in which *658 California courts repeatedly have allowed recovery of construction repair costs.
Eleven years after Seely, the Court of Appeal in Cooper v. Jevne (1976) 56 Cal.App.3d 860 [128 Cal.Rptr. 724] (Cooper), allowed a negligence suit by condominium owners against architects, for “economic loss” damages (id.., at p. 868) that included “cost of repairs” (id., at p. 867, fn. 2). Eight years later, the Court of Appeal decision in Huang v. Gamer (1984) 157 Cal.App.3d 404 [203 Cal.Rptr. 800] (Huang), presented a situation essentially identical to the one that we address in this case. Apartment building owners sued the developer and contractor for costs to remedy serious safety code violations that, like the present case, fell into two categories: (i) building safety code violations that had manifested themselves in physical damage (id., at p. 419 [these consisted of “deflected and cracked beams and dry rot damages to the balcony area”]), and (ii) building safety code violations that had not yet manifested themselves in physical damage (id., at pp. 419-420 [in Huang, as here, these consisted of inadequate or missing “firewalls, shear walls, fire stops, and other alleged defects in the structure which had not yet caused actual physical damages at the time of trial”]). The Court of Appeal in Huang, distinguishing Seely, ruled that the apartment owners could recover repair costs to remedy the serious building safety code violations that had not yet manifested themselves in physical damage. (Id., at pp. 421-425.) Addressing the crucial question whether there was sufficient certainty that the plaintiffs in that case had suffered harm, the court noted in Huang that the defects were “dangerous, despite the fact that for approximately 17 years they have not caused personal injury to any tenant.” (Id., at p. 424.) That court further observed: “Failure to comply with the Uniform Building Code by a developer-contractor involves potential risk of harm to later purchasers. In this case ample evidence was offered with respect to the cost of repairing the subject defects. Thus it is relatively certain that plaintiffs have suffered injury as a result of the defects. . . . [Pjlaintiffs have . . . suffered damages in being forced to repair the building.” (Ibid.)
In Sumitomo Bank v. Taurus Developers, Inc. (1986) 185 Cal.App.3d 211 [229 Cal.Rptr. 719], a California appellate court followed Huang, supra, 157 Cal.App.3d 404, and Cooper, supra, 56 Cal.App.3d 860, allowing a purchaser of a condominium complex to pursue a negligence action against the builder for the cost to repair both then existing physical damage, e.g., cracking concrete and leaking roofs, and, apparently, detriment that had not yet manifested itself in physical damage, e.g., improperly designed drainage and structural retaining walls. (185 Cal.App.3d at pp. 216, 223-226.) Subsequently, construction litigation decisions of our Courts of Appeal that have had occasion to address the aspect of Huang that is relevant here have *659 uniformly treated Huang's analysis as accepted and established law. (See, e.g., Keru Investments, Inc. v. Cube Co. (1998) 63 Cal.App.4th 1412, 1421-1422 [74 Cal.Rptr.2d 744] [noting that in Huang the plaintiffs were not seeking lost opportunity costs, but instead, “ ‘the cost to repair the defects in the structure in order to bring it into compliance with the Uniform Building Code’ ”]; Krusi v. S.J. Amoroso Construction Co. (2000) 81 Cal.App.4th 995, 1000-1001 [97 Cal.Rptr.2d 294] [describing with apparent approval Huang's conclusion that “the plaintiffs were entitled to economic damages” in order to correct building code violations “in addition to recovery for physical damage” and noting testimony in Huang that the defects were “ ‘dangerous, despite the fact that for approximately 17 years they have not caused personal injury to any tenant’ ”]; cf. Stearman v. Centex Homes (2000) 78 Cal.App.4th 611, 618 [92 Cal.Rptr.2d 761] [discussing with approval “Huang's definition and application of [Seely's] economic loss rule”].)
D.
Finally, the above reading of Seely, supra, 63 Cal.2d 9, also is confirmed by numerous cases from other jurisdictions that permit recovery of construction repair costs essentially identical to those here at issue. Although the majority adopts a broad view of the Seely dictum as barring recovery of costs for repair of construction defects that pose a substantial risk to persons and property, the trend of well-reasoned sister-court decisions is in the opposite direction.
Almost all of the out-of-state decisions in this area cite and discuss Seely and adopt in general a version of the rule set out in that case, restricting recovery for commercial expectation damages. These sister-state decisions recognize that Seely was concerned primarily with precluding potentially limitless damages for lost profits and/or lost commercial expectations in the context of suits for product liability, and these out-of-state cases also recognize, explicitly or implicitly, that suits for costs to repair and correct dwelling safety defects that pose a serious risk to life and limb are clearly distinguishable from Seely and do not similarly implicate concerns of limitless damages.
The majority, ante, at page 636, footnote 7, mentions three such out-of-state decisions. (.Kennedy v. Columbia Lumber & Mfg. Co. (1989) 299 S.C. 335 [384 S.E.2d 730, 737] [a builder does not escape liability for building code violations merely because “luck has smiled upon him and no physical harm has yet occurred. . . . [W]e once again join those states which strive to protect the modem new home buyer”]; Oates v. Jag, Inc. (1985) 314 N.C. 276 [333 S.E.2d 222, 225-226] [allowing recovery of repair costs to correct *660 building code violations that had apparently not caused physical damages, and noting, “[w]e must be realistic. . . . The purchaser can ill afford to suddenly find a latent defect in his or her home . . . and have no remedy for recourse”]; Council of Co-Owners v. Whiting-Turner, supra, 517 A.2d 336 {Whiting-Turner).)
The Whiting-Turner case is especially well reasoned and particularly apt here. In that case the Maryland high court permitted the plaintiff in a negligence action to recover the costs necessary to correct the construction of 10 vertical utility shafts in a 22-story condominium complex. The shafts presented a fire hazard because of the absence of required insulation—a serious violation of applicable building codes. (Whiting-Turner, supra, 517 A.2d at pp. 338-339.) Although the defective shafts all posed a clear danger of death or personal injury, none of them yet had produced any personal injury or physical property damage.
The Whiting-Turner decision held: “ ‘We reject the contention by appellant that there can be no recovery in negligence absent proof of personal injury or property damage. We hold that there can be recovery for economic loss. Why should a buyer have to wait for a personal tragedy to occur in order to recover damages to remedy or repair defects? In the final analysis, the cost to the developer for a resulting tragedy could be far greater than the cost of remedying the condition.’ fl[] We conclude that the determination of whether a duty will be imposed in this type of case should depend upon the risk generated by the negligent conduct, rather than upon the fortuitous circumstance of the nature of the resultant damage. Where the risk is of death or personal injury the action will lie for recovery of the reasonable cost of correcting the dangerous condition.” (Whiting-Turner, supra, 517 A.2d at p. 345, fn. omitted.)[1]
In addition to these authorities, it is instructive to consider another out-of-state decision relied upon by defendants to support their assertion that all repair and correction costs in the present case should be barred under Seely’s rule restricting recovery of commercial expectation damages. As defendants observe, the Florida Supreme Court’s closely divided decision in Casa Clara v. Charley Toppino and Sons (Fla. 1993) 620 So.2d 1244 (Casa Clara) does support defendants’ and the majority’s position. There, a condominium association sued the supplier of concrete for having provided defective *661 concrete with a high salt content that caused it to crack, putting at risk the dwellings constructed with the concrete. The Florida high court, employing a broad interpretation of Seely’s dictum barring recovery of commercial expectation damages (Casa Clara, at p. 1245 et seq.), and ignoring Chief Justice Traynor’s caution against relying on contract law to protect homeowners in such circumstances (see ante, at pp. 654-655), concluded that home buyers should “ ‘bear the cost of economic losses sustained by those who failed to bargain for adequate contract remedies’ ” (Casa Clara, at p. 1247), and denied the condominium association any recovery in negligence premised upon “the mere possibility” that the defective concrete “will cause physical injury.” (Id., at p. 1247.) The court reasoned in Casa Clara that the plaintiffs’ “argument goes completely against the principle that injury must occur before a negligence action exists. Because an injury has not occurred, its extent and the identity of injured persons is completely speculative.” (Ibid., italics added.) The court in Casa Clara was divided four to three, and reached its conclusion over the dissenting justices’ protestations that “it stretches reason to apply the [economic loss] doctrine in this context.” (Id., at p. 1248 (cone. & dis. opn. of Barkett, C. J.).)
Defendants, however, overlook the subsequent history of Casa Clara. More than a year ago, the Florida Supreme Court, by a six-to-one vote, “effectively overruled” that case. (Moransais v. Heathman (Fla. 1999) 744 So.2d 973, 985 (dis. opn. of Overton, J.) [characterizing the majority opinion] (Moransais).)[2] The Florida high court’s analysis and observations in Moransais concerning the proper scope of Seely’s rule barring recovery of commercial expectation damages are especially instructive and strongly repudiate the broad application of the rule proposed by defendants and the majority.
Moransais, supra, 744 So.2d 973, was a suit by a homeowner against a professional engineer who had inspected the plaintiff’s home prior to purchase. The inspection had failed to disclose various (unspecified) defects that “rendered the home uninhabitable” (id., at p. 975), but which had not yet caused any property damage or personal injury. The plaintiff was not in privity with the engineer, but was with the engineer’s employer. The plaintiff sued the engineer personally for his negligent inspection of the home.
*662 Consistent with Cooper, supra, 56 Cal.App.3d 860, in which our Court of Appeal permitted a similar action against architects, the Florida high court in Moransais, supra, 744 So.2d 973, allowed the negligence suit against the engineer. In the process, the Florida court explained that its prior decisions—including, most notably, Casa Clara—“[ujnfortunately” had extended the economic loss doctrine “beyond its principled origins and have contributed to applications of the rule . . . well beyond our original intent.” (Moransais, supra, 744 So.2d at p. 980, italics added).) The court held that henceforth, the doctrine would be limited in order to avoid precluding traditional and well-established actions in tort. (Id., at p. 983.)
Underscoring its retreat from its prior applications of Seely’s economic loss rule, the court explained in Moransais: “Today, we again emphasize that by recognizing that the economic loss rule may have some genuine, but limited, value in our damages law, we never intended to bar well-established common law causes of action, such as those for neglect in providing professional services. Rather, the rule was primarily intended to limit actions in the product liability context, and its application should generally be limited to those contexts or situations where the policy considerations are substantially identical to those underlying the product liability-type analysis. . . . The rule, in any case, should not be invoked to bar well-established causes of actions in tort . . . .” (Moransais, supra, 744 So.2d at p. 983, fn. omitted, italics added.) The court in Moransais concluded by stressing that “ ‘ [i]f the doctrine were ■ genuinely applied to bar “all tort claims for economic losses without accompanying personal injury or property damage, ” the rule would wreak havoc on the common law of torts.’ ” (Ibid., italics added.)
Instead of expanding the reach of Seely’s rule barring recovery of commercial expectation damages beyond its proper original and intended scope, and instead of reaching to distinguish and disapprove established California Court of Appeal decisions that appropriately have limited the scope of Seely’s dictum in the context of serious building code violations, we should, like the Florida Supreme Court, recognize the appropriate limited reach of the Seely doctrine so that it does not preclude application of traditional rules of negligence permitting limited and rational recovery of correction costs in the circumstances here presented.
II.
Even outside the construction defect context, past California decisions do not support the majority’s conclusion that the dictum in Seely, supra, 63 Cal.2d 9, properly should be interpreted to bar a plaintiff in a negligence action from recovering damages in the absence of personal injury or physical property damage.
*663 For example, in Potter v. Firestone Tire & Rubber Co. (1993) 6 Cal.4th 965 [25 Cal.Rptr.2d 550, 863 P.2d 795] (Potter), a case in which the plaintiffs were negligently exposed to carcinogens in their drinking water, we approved the plaintiffs’ recovery of costs for medical monitoring, prior to any actual manifestation of personal injury. (Id., at p. 974.) Our reasoning in Potter in permitting the plaintiffs to recover the costs of medical monitoring is instructive here.
First, Potter, supra, 6 Cal.4th 965, employing established tort analysis, allowed recovery of costs to monitor an increased risk of future illness even though there was no “present physical injury or illness” (id., at p. 974), upon a showing that the need for such monitoring was a reasonably necessary response to the defendant’s negligent acts. (Id., at p. 1009.) The same reasoning applies here: Costs to remedy the most serious building code safety violations should be allowed to the extent they are a reasonably prudent and necessary response to the defendants’ negligent acts, incurred to avoid or minimize the damage that will result from such negligence.
Second, Potter, supra, 6 Cal.4th 965, approved the recovery of these limited damages, without regard to the majority’s broad reading of the Seely dictum. Potter is obviously distinguishable from Seely, in that Potter addressed medical monitoring costs designed to guard against severe personal injury, whereas the Seely dictum was addressed to the question of allowing recovery of potentially limitless lost profits and lost commercial expectations. In the same fashion, the present case also is distinguishable from Seely—here we are concerned with repair costs designed to guard against severe personal injury and property damage caused by negligent construction of residential housing. Seely’s dictum did not stand in the way of allowing monitoring costs in Potter, and it does not stand in the way of allowing repair costs here.
Third, as plaintiffs observe in their briefs, and as Potter, supra, 6 Cal.4th 965, stressed {id., at pp. 1005-1006), Civil Code section 3333 provides that a plaintiff may recover in negligence damages “for all the detriment proximately caused thereby” (italics added)—the statute imposes no requirement of a showing of present physical injury or property damage.[3] This statute and comparable provisions of the Restatement Second of Torts (§§ 7, 910, & 917) are at odds with the majority’s broad application of the Seely dictum and with its holding that, in the absence of present physical injury or *664 property damage, costs to remedy the most serious building code safety violations conceded here are not recoverable in negligence.
Fourth, just as we acknowledged in Potter, supra, 6 Cal.4th 965, with regard to the various policy reasons supporting recovery of medical monitoring costs in that case (id., at p. 1008), here as well, policy factors relating to public safety, deterrence, rnitigation of damages, economic efficiency, and “societal notions of fairness and elemental justice” (ibid.) all militate in favor of allowing the limited recovery proposed.
Finally, as was true with regard to the medical monitoring costs at issue in Potter, supra, 6 Cal.4th 965, the policy factors supporting the conclusion that we should allow recovery of costs to repair the most serious safety code defects here at issue—considerations aimed at ensuring that known safety risks in our housing stock are avoided, or at least corrected—in this case militate in favor of adopting a “fund remedy” procedure that we described with approval in Potter, supra, 6 Cal.4th at page 1010, footnote 28.[4]
in.
As the majority implicitly concedes, the scope of Seely’s dictum, supra, 63 Cal.2d at page 18, has been limited in a variety of contexts by decisions allowing such recovery upon a proper showing based upon the familiar six-factor test set out in Biakanja v. Irving (1958) 49 Cal.2d 647 [320 P.2d 16, 65 A.L.R.2d 1358] (Biakanja) and J’Aire Corp. v. Gregory (1979) 24 Cal.3d 799 [157 Cal.Rptr. 407, 598 P.2d 60] (J’Aire). In light of that authority, the majority finds it necessary to paraphrase the question before us as follows: “Does the law of negligence protect plaintiffs’ economic interests in having houses that fully comply with the building codes, measured by the cost of repairs or diminished value associated with noncompliance, even *665 though the asserted harm to those interests is unaccompanied by any injury to person or property?” (Maj. opn., ante, at p. 645, italics added.)
By reformulating the question in this manner, the majority skews the inquiry and fails adequately to consider that even if a negligence action cannot be maintained for the costs of remedying every minor building code violation, general common law negligence principles support a cause of action for the costs of correcting serious building code safety violations that pose a significant risk of death, serious personal injury, or considerable property damage if left unremedied.[5]
In applying the traditional six-factor test, the majority determines with very little discussion that four of the six relevant factors set out in Biakanja, supra, 49 Cal.2d at page 650, and J’Aire, supra, 24 Cal.3d at page 804, support plaintiffs’ right to sue in negligence for repair costs, but that two of the factors do not support a negligence action for costs of repair. The majority applies these factors out of their traditional order, and I shall do so here as well, addressing last the two assertedly problematic factors.
A.
Factor (1): The extent to which the transaction was intended to affect plaintiffs. The majority, in a single sentence, “assume[s] for argument’s sake that the conduct of a person engaged in construction is ‘intended to affect’ *666 all foreseeable purchasers of the property.” (Maj. opn., ante, at p. 646.) It is unclear why the majority includes that qualification; this factor is quite clearly met, and is in fact established law, as the Court of Appeal—which ultimately agreed with the majority’s conclusion that the repair costs sought by plaintiffs are not recoverable—readily acknowledged. The appellate court stated: “It is undisputed that the 162-unit residential condominium project at issue in the pending Provencal case was developed and built by [codefendant] Lyon. The subcontractors were also involved in the construction of Provencal. It is also undisputed that the Aas [plaintiffs’] single-family homes were developed and built by Lyon, and that Lyon subcontracted with several design and construction professionals to design and build the homes. flO These facts are sufficient to satisfy the first Biakanja factor under well-settled case law." (Italics added.) I believe the majority should acknowledge, and not minimize, plaintiffs’ strong showing with regard to this factor.
B.
Factor (4): The closeness of the connection between defendants’ conduct and the injury suffered. The majority also “assume[s] that a sufficiently ‘close[] connection [exists] between . . . defendant’s conduct’ and the alleged defects.” (Maj. opn., ante, at p. 647.) Again, the Court of Appeal expressed no hesitation on this point, stating: “Lyon and subcontractors do not vigorously contend their conduct is remote to [plaintiffs’] alleged harm. Their alleged conduct is sufficiently connected to the alleged construction defects alleged in the [plaintiffs’] pleadings.”
C.
Factor (5): The moral blame attached to defendants’ conduct. The majority concedes that “some ‘moral blame’ arguably ‘attach[es]’ to many deviations from the building codes,” but asserts that “the degree of blame would appear to depend upon the nature of the deviation.” (Maj. opn., ante, at p. 647, italics added.) Yet again, the Court of Appeal did not couch its review of this factor in such a grudging manner. It first quoted Chief Justice Traynor’s discussion in Connor, supra, 69 Cal.2d at page 867, of the importance of providing a remedy in negligence for homeowner victims of defective construction, and then noted:
“Chief Justice Traynor’s observations are relevant here in light of [plaintiffs’] allegations and offers of proof that the construction of their homes fell below the standard of care and failed to comply with the minimum requirements for shear walls and fire walls as set forth in the Uniform Building Code, and the minimum requirements set forth in the National Electrical *667 Code. In Huang, supra, 157 Cal.App.3d at page 424, the court addressed the moral blameworthiness of violating building codes and contracting regulations: ‘[Considering the importance of the minimum standards for housing set forth in the pertinent provisions of the Uniform Building Code, the violation of those standards involves sufficient “moral blame” to meet the fifth of the six criteria adopted in J’Aire . . . .’
“[Plaintiffs] assert that assessing moral blame for violating building codes reflects California’s strong policy in favor of quality construction of homes. We agree. . . . ‘[Negligent construction principles rest on a policy determination that purchasers of homes should not be harmed by defective housing caused by a breach of the duty to construct properly . . . .’”
Once again, I submit that the majority ought to acknowledge, and not minimize, plaintiffs’ strong showing with regard to this factor.[6]
D.
Factor (6): The policy of preventing future harm. The majority concedes that this is “probably plaintiffs’ strongest argument.” (Maj. opn., ante, at p. 647.) The majority notes that the policy of preventing future harm “might be served by a rule of tort liability” that permits recovery of repair costs on the facts alleged here. {Ibid., italics added.) The majority further acknowledges that it “might be less expensive,” as plaintiffs argue, “to require builders to pay to correct defects as soon as they are detected rather than after property damage or personal injury has occurred.” (Ibid., italics added.)
After conceding these points, the majority proceeds, however, to diminish the weight of this factor by the majority’s depiction of the present suit, asserting that plaintiffs seek to make the “builders, in effect, the insurers of building code compliance, even as to defects that have not caused property damage or personal injury.” (Maj., opn., ante, at p. 649, italics added.)
Contrary to the majority’s mischaracterization, plaintiffs’ action in this case clearly does not attempt to make defendants “insurers.” The suit simply seeks to have defendants pay limited repair costs necessitated by defendants’ concededly negligent conduct in constructing plaintiffs’ homes. Moreover, the majority fails to acknowledge that any liability on the part of defendants *668 plainly is limited in duration—it expires, by statute, 10 years after the completion of construction (Code Civ. Proc., § 337.15)—which period may have already elapsed in this litigation.[7]
The majority also asserts that allowing the limited form of recovery sought here “should also be unnecessary to the extent buyers timely enforce their contract, warranty and inspection rights, and to the extent building authorities vigorously enforce the applicable codes for new construction.” (Maj., opn., ante, at p. 649, italics added.) That is true, but it begs the question that we are required to answer: What remedy is there when there is no privity, and hence there are no contract rights, or when there is privity, but disclaimers or technical notice rules preclude enforcement of contract rights (see ante, at pp. 654-655, or when there is inspection, but the defect cannot reasonably be noticed by the usual home buyer (see Connor, supra, 69 Cal.2d at p. 867; Kriegler, supra, 269 Cal.App.2d at p. 228)—or when, as apparently has occurred with alarming frequency, local building inspectors (for whatever reason) fail to notice and require correction of serious building code safety violations? Does the “policy in favor of preventing future harm” call for recognition of a limited negligence action to fill the gaps in such circumstances? The majority never satisfactorily answers this crucial question.
Again, the Court of Appeal had no trouble with this factor. It wrote:
“The policy of preventing future harm is fundamental to the tort system, and California case law demonstrates this policy applies to safeguarding against preventable construction defects which result in physical injuries to people and property. . . . [As] our high court [has] stated:‘[T]he prevention of future negligent construction of buildings upon insufficiently supportive material would not be furthered by exempting [the builder] from liability for his negligence. [Citations.]’
“. . . [I]n Connor, supra, 69 Cal.2d at pages 867-868, Chief Justice Traynor eloquently expressed the judiciary’s concern for proper construction of housing in California: ‘The admonitory policy of the law of torts calls for the imposition of liability on [defendant] for its conduct in this case. Rules that tend to discourage misconduct are particularly appropriate when applied to an established industry. [H] By all the foregoing tests, [defendant] had a duty to exercise reasonable care to prevent the construction and sale of seriously defective homes to plaintiffs. ... In any event, there is no enduring social utility in fostering the construction of seriously defective homes.’
*669 “Here, [plaintiffs] have alleged causes of action in negligence against a home developer, a general contractor, and various housing subcontractors for recovery of damages resulting from numerous alleged construction defects, including but not limited to serious violations of minimum standards set forth in the Uniform Building Code and other governing codes. The policy concern for ensuring proper construction of vital structural housing components, such as shear walls, is meant to protect not only the physical structure, but also the personal safety of all homeowners.” (Italics added.)
In an immediately following footnote, the Court of Appeal observed: “In this regard, we take judicial notice of one of the recommendations of the California State Seismic Commission, which investigated the Northridge earthquake under our Governor’s Earthquake Executive Order: ‘The greatest opportunity to ensure seismic safety is during a building’s design and construction. . . . The Northridge earthquake and other past earthquakes have clearly and repeatedly demonstrated the remarkable effectiveness of paying attention to quality in reducing earthquake losses. Quality assurance is the single most important policy improvement needed to manage California’s earthquake risk.’ (California Seismic Safety Commission, ‘Northridge Earthquake: Turning Loss To Gain,’ Dec. 1, 1994, at p. 22, italics added.)”[8]
In my view, the policy of preventing future harm operates here as a factor that very strongly militates in favor of recognizing a right of action in negligence to recover costs to remedy safety code violations that pose a serious threat of injury to the residents of and visitors to the dwellings here at issue. Once again, I submit that the majority should frankly concede, rather than attempt to minimize, plaintiffs’ strong showing with regard to this factor.
E.
Factor (2): The foreseeability of harm to plaintiffs. The majority’s entire treatment of this factor is as follows: “[T]o ask . . . whether the harm to plaintiffs was ‘foreseeable]’ [citation] simply begs the question: What harm?” (Maj. opn., ante, at p. 646.)
In contrast to the majority’s approach, the Court of Appeal stated: “[T]he Supreme Court cases that have addressed the second Biakanja factor ... in the construction defect context have held that harm to homeowners caused by negligent construction is foreseeable. [Citations.] [^] . . . [Here,] as to the alleged violations of governing building codes, it is foreseeable that such *670 code violations may result in otherwise preventable injury to persons or other property. For example, it is foreseeable that an insufficient fire wall in a condominium may fail in the event there is a fire in an adjoining unit, resulting in a conflagration that could have been prevented had the fire wall been constructed in compliance with the minimum building code safety standards.” (Italics added.)
It is foreseeable that a reasonably prudent person, made aware of seriously deficient shear walls and fire walls in his or her home, would suffer appreciable present harm by virtue of being exposed to, and thereby having the legal duty to address (see post, pp. 671-672), a known unreasonable risk to personal safety and to property.
F.
Factor (3): The degree of certainty that plaintiffs suffered injury. This is the factor that the majority finds is both (i) the most important in this case, and (ii) the one that presents a “relatively objective obstacle to plaintiffs’ claim” to recover the cost of remedying the serious building code safety violations conceded on this record. (Maj. opn., ante, at p. 645.) The majority begins with the premise that “[cjonstraction defects that have not ripened into property damage, or at least into involuntary out-of-pocket losses, do not comfortably fit the definition of ‘ “appreciable harm” ’—an essential element of a negligence claim.” (Id., at pp. 645-646, citing Davies v. Krasna (1975) 14 Cal.3d 502, 513 [121 Cal.Rptr. 705, 535 P.2d 1161, 79 A.L.R.3d 807] (Davies).)
Davies, supra, 14 Cal.3d 502, is not on point. That case addressed the question at what point, after a breach of duty, a plaintiff suffers damages sufficient to begin the running of the statute of limitations. Davies did not concern, and did not address, whether, and under what conditions, the incurring of reasonably necessary repair costs in the absence of personal injury or property damage would establish a sufficient degree of certainty that injury had been suffered. Of course, a decision does not stand for a proposition that it did not address or consider.
The majority nevertheless relies upon Davies, supra, 14 Cal.3d 502, to support its implicit conclusion that on the facts presented, there exists an insufficient degree of certainty that plaintiffs have suffered harm.[9] I believe that under the standard of review articulated by the majority, the conclusion it reaches is incorrect.
*671 As the majority asserts, “the question is whether, disregarding conflicting evidence, indulging in every legitimate inference that may be drawn from the evidence, and viewing the record in the light most favorable to plaintiffs,” there is substantial evidence to support a judgment in plaintiffs’ favor. (Maj. opn., ante, at p. 634, italics added.) In my view, if we faithfully apply that standard, we must conclude that there is substantial evidence establishing with sufficient certainty that with regard to the most serious safety code violations at issue in this litigation, plaintiffs have suffered appreciable present injury or harm.
The Court of Appeal below expressly found that the crucial “degree of certainty that plaintiffs suffered injury” factor was met on these facts. The Court of Appeal stated: “[W]e agree with the Huang court’s conclusion that evidence of a negligent failure by a developer or contractor to comply with the minimum standards set forth in governing building codes, supported by evidence of the cost to repair the building code violations, is sufficient to satisfy the Biakanja ‘degree of certainty of harm’ factor.” The Court of Appeal quoted extensively from offers of proof by experts retained by both plaintiffs and defendants, to the effect that the dwellings contained inadequate shear walls and fire walls, and that repairs to correct these problems would cost “several hundreds of thousands of dollars,” and then concluded: “[Plaintiffs’] offer of proof, and the construction defect allegations in [the] complaint in connection with the negligence cause of action, are sufficient to show the requisite certainty . . . that [plaintiffs] have suffered latent harm.”
As suggested above, I agree with the majority to the extent it declines to allow recovery in negligence for the cost of repairing construction defects that pose no significant risk of serious personal injury or property damage. Accordingly, I would not recognize a negligence action to recover the costs of repairing matters such as “discolored drain stoppers, and inoperable garbage disposals.” (Maj. opn., ante, at p. 647.) On the other hand, I believe that by being subjected to the risk posed by defective shear walls and fire walls, plaintiffs have suffered appreciable present compensable injury.[10] Indeed, plaintiffs’ knowledge of these defects places upon them a legal duty to make necessary repairs or corrections.
*672 Most of the plaintiffs in these consolidated cases (those who live in condominiums) are under legal compulsion, through their condominium association, to repair common areas—and this would certainly include a duty to remedy known major safety violations in shear walls and fire walls located in common areas that had not yet caused actual physical damage or injury. (Civ. Code §§ 1364, subd. (a) [duty to repair common areas], 1351, subd. (b) [common area defined].)
Similarly, all single-family-structure homeowner plaintiffs in this proceeding are under a duty to disclose known defects to potential purchasers, and perhaps more importantly, like any possessor of real property, they also are under a legal obligation to take reasonable steps to remedy known safety defects in or on their own property. A reasonably prudent homeowner, learning of, for example, the serious shear wall or fire wall defects in his or her home, would act to correct or repair those defects, in order to avoid unreasonable risk of collapse of the structure during a windstorm or earthquake, or in order to avoid rapid spread of a fire from one room to others.
Plaintiffs’ showing here is no less than that found to be adequate in similar circumstances in Cooper, supra, 56 Cal.App.3d 860, Huang, supra, 157 Cal.App.3d 404, Sumitomo Bank v. Taurus Developers, Inc., supra, 185 Cal.App.3d 211, and in various out-of-state decisions—most notably, the Maryland high court’s decision in Whiting-Turner, supra, 517 A.2d 336 and the Florida Supreme Court’s decision in Morans ais, supra, 744 So.2d 973. Nor is plaintiffs’ showing any less than that found to be adequate in analogous circumstances in Potter, supra, 6 Cal.4th 965.
I submit that on these facts compensable present injury to plaintiffs is reasonably certain, because a reasonably prudent person, having become aware of the unreasonable risk posed by known building code safety defects such as inadequate shear walls and fire walls, would act to repair or correct those defects. I would recognize a limited negligence action as described above, and, in light of the public interest in ensuring that such repairs *673 actually are undertaken, I would require court-supervised disbursement of damages awarded in such cases. (See Potter, supra, 6 Cal.4th at p. 1010, fn. 28, quoted ante, fn. 4.)[11]
IV.
California is prone to earthquakes and, tragically, the negligent construction of residential housing almost surely will result in the deaths and injury of numerous current and future residents of this state, as it has in the past. In the context of a case such as the one now before us, the goal of tort law is to minimize, in an appropriate and balanced manner, the number of those deaths and injuries. In light of today’s majority opinion—which misapplies and improperly disapproves California’s established case law and, in failing to recognize an appropriate and limited right to recover costs to remedy serious safety code violations, rejects the reasoning of well-considered decisions of our sister-state courts—the obligation falls upon the Legislature to correct this court’s unfortunate misstep in the development of the law, and to provide the protection that California residents deserve.
MOSK, J., Concurring and Dissenting.
Because I believe it is economically efficient to provide plaintiffs with a remedy to repair conditions that allegedly pose a serious safety hazard, I respectfully dissent from the majority’s contrary conclusion. I believe the Supreme Court of Indiana pointed out quite well the inefficiency inherent in the economic loss rule as applied to such conditions: “If there is a defect in a stairway and the purchaser repairs the defect and suffers an economic loss, should he fail to recover because he did not wait until he or some member of his family fell down the stairs and broke his neck?” (Barnes v. Mac Brown & Company, Inc. (1976) 264 Ind. 227, 230 [342 N.E.2d 619, 621].) Thus, to answer the majority’s rhetorical question, “What harm?” (maj. opn., ante, at p. 646), I would say, the harm that will arise when homeowners, believing, as humans are wont to do, that injury only befalls others, fail to repair hazardous conditions.
It is evident that many Californians live in modem mass-market housing. It appears, moreover, that cutting comers is a prevailing problem in the development industry. The descriptions of construction defects in the numerous letter briefs we have received from the constmction law bar suggest as much. The briefs describe the willingness of some developers to evade or stint the Uniform Building Code’s safety requirements, among other elements. In this context, the majority’s result is likely, as one litigant put it, to *674 create “an invitation for developers, general contractors and subcontractors to ignore [construction] Code requirements when building and developing homes.”
The majority tacitly acknowledge the risks of inefficiency their rule generates: “[T]o require builders to pay to correct defects as soon as they are detected rather than after property damage or personal injury has occurred might be less expensive. On the other hand, such a rule would likely increase the cost of housing by an unforeseeable amount as builders raised prices to cover the increased risk of liability.” (Maj. opn., ante, at p. 649.) The first sentence in the quotation is almost certainly correct, as it is less costly to society to require a contractor to nail down the loose stair than to pay for hospitalization after a needless tumble down the flight of steps. The second sentence, by contrast, even if correct, assumes that builders are inadequately constructing mass-market housing—there is no risk of liability if the housing is correctly built. And it can only be correct if builders pass along the savings realized by poor construction to their customers, rather than realizing increased profits from deficient building practices. I do not share the majority’s evident assumption that the former is correct.
I would adopt a view similar to that of Judge Richard Posner in Eljer Mfg., Inc. v. Liberty Mut. Ins. Co. (7th Cir. 1992) 972 F.2d 805 (Eljer). Interpreting comprehensive general liability insurance policies that defined the term “property damage” as “ ‘physical injury to . . . tangible property’ ” (id. at p. 807), but considering facts similar to those of this case, Posner wrote that physical injury to property occurs when it “results from . . . physical linkage, as when a potentially dangerous product is incorporated into another and, because it is incorporated and not merely contained (as a piece of furniture is contained in a house but can be removed without damage to the house), must be removed, at some cost, in order to prevent the danger from materializing. There is an analogy to fixtures in the law of real and personal property—improvements to property that cannot be removed without damaging it. See, e.g., UCC § 9-313.” (Id. at p. 810, italics added.)[1]
The Eljer approach obviates the need to consider the Biakanja factors (Biakanja v. Irving (1958) 49 Cal.2d 647, 650 [320 P.2d 16, 65 A.L.R.2d 1358]; see Ott v. Alfa-Laval Agri, Inc. (1995) 31 Cal.App.4th 1439, 1449 [37 Cal.Rptr.2d 790])—although even under those factors I believe, like the Chief Justice but unlike the majority, that damages are sufficiently ascertainable to justify liability. The rule I favor would state that property damage occurs when what may be termed “fixtures” for purposes of discussion, *675 inseparable from the structure of the houses or condominiums and inaccessible for repair without destroying existing features, are negligently built or installed. (Cf. Cal. U. Com. Code, § 9102, subd. (a)(41).)[2]
We here consider alleged latent defects, capable of causing serious injury or major property damage, that may only be found years or decades after the developer caused them, yet require repair to avoid later injury or major property loss. (In this regard, Code Civ. Proc., § 337.15 permits recovery for property damage caused by latent defects in construction only for 10 years after the work is substantially completed. The statute of limitations is already a substantial bar to any threat of limitless liability.) I believe a narrow rule could be drawn to provide a tort remedy for such defects. It seems that a finely crafted rule would not need to apply to such items as negligent heating, air conditioning, and ventilation work, or, to refer to the majority’s rather dismissive examples, “doors that are out of plumb, discolored drain stoppers, and inoperable garbage disposals” (maj. opn., ante, at p. 647). (See Council of Co-Owners v. Whiting-Turner (1986) 308 Md. 18, 35, fn. 5 [517 A.2d 336, 345] [limiting recovery to fixing defects that pose “a clear danger of death or personal injury”].)[3] I regret the majority’s unwillingness to adopt even a minimal safeguard. The proper view, I believe, is that articulated in Biakanja: “Liability has [been] imposed, in the absence of privity, upon suppliers of goods and services which, if negligently made or rendered, are ‘reasonably certain to place life and limb in peril.’ ” (Biakanja v. Irving, supra, 49 Cal.2d 647, 649.)

In the omitted footnote, the court wrote in Whiting-Turner: “It is the serious nature of the risk that persuades us to recognize the cause of action in the absence of actual injury. Accordingly, conditions that present a risk to general health, welfare, or comfort but fall short of presenting a clear danger of death or personal injury will not suffice. A claim that defective design or construction has produced a drafty condition that may lead to a cold or pneumonia would not be sufficient.” (Whiting-Turner, supra, 517 A.2d at p. 345, fn. 5.)

The opinion in Moransais was filed after briefing in the present case was completed. On August 28, 2000, however, codefendant William Lyon Company filed a “Supplemental Brief of Additional Authorities,” citing and discussing the recent subsequent history of a Nevada case cited in earlier briefs, and citing three other recent (and distinguishable) cases from other jurisdictions. Nonetheless, the supplemental brief failed to note that, more than one year earlier, the Florida Supreme Court effectively had overruled Casa Clara, supra, 620 So.2d 1244, the primary out-of-state case upon which Lyon had relied in its “Answer Brief on the Merits.”

That statute provides: “For the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not.” (Civ. Code, § 3333.)

Our opinion in Potter stated in this regard: “Various commentators and courts have suggested that creation of court-supervised funds to pay medical monitoring claims as they accrue, rather than the award of a lump-sum verdict, may be a more appropriate mechanism for compensating plaintiffs in a toxic exposure case. [Citation.] In Ayers [v. Jackson Tp. (1987) 106 N.J. 557 [525 A.2d 287, 314, 76 A.L.R.4th 571]], the court observed: ‘Although conventional damage awards do not restrict plaintiffs in the use of money paid as compensatory damages, mass-exposure toxic tort cases involve public interests not present in conventional tort litigation. The public health interest is served by a fund mechanism that encourages regular medical monitoring for victims of toxic exposure.’ [Citation.] Thus, in contrast to a lump-sum payment, a fund remedy will encourage plaintiffs to spend money to safeguard their health by not allowing them the option of spending the money for other purposes. The fund remedy will also assure that medical monitoring damages will be paid only to compensate for medical examinations and tests actually administered, thus serving to limit the liability of defendants to the amount of expenses actually incurred. (Ibid.) In turn, this should tend to reduce insurance costs, both to potential defendants and the general public alike.” (Potter, supra, 6 Cal.4th at p. 1010, fn. 28.)

Although plaintiffs’ complaint sought, among other things, damages for the diminution in value of their homes, plaintiffs’ briefing and argument before this court make it quite clear that they have abandoned any such claim and that they now limit their negligence claim regarding code violations that have not manifested themselves in physical injury or property damage to recovery of repair costs. Plaintiffs’ joint opening brief states the issue as follows: “Can homeowners and a homeowners association . . . recover in negligence for the cost to repair violations of governing building codes . . . even though the violations have not yet caused physical property damage?” (Italics added.) This phrasing of the issue and this singular focus- of recovery sought at this stage in the litigation is repeated throughout the briefing. Indeed, plaintiffs specifically assert, “the measure of damages for negligent construction is limited to the cost of repair. Imaginative consequential damages are not applicable.” (Italics added.) And plaintiffs also argue that defendants in this case should be responsible “only ... for compliance with governing building codes” and “will not be exposed to monetary damages beyond the cost of repair.” Similarly, at oral argument, counsel for plaintiffs asserted that at this stage plaintiffs do not seek lost profits or any other such difficult-to-define form of damages, but instead, and only, funds necessary to address “very specific code violations for which specific repairs are designed and for which there is a known measure of damages”—namely, the specific “costs to repair code violations.”
Thus, the matter in contention, at this point, is simply whether, with respect to code violations that have not manifested themselves in physical injury or property damage, we should recognize a limited negligence action for recovery of specific and definable repair costs. In my view it does not advance this inquiry for the majority to invoke repeatedly plaintiffs’ now abandoned claim for damages relating to the diminished value of their homes.

At the same time, I completely agree with the majority’s additional assertion that “we may . . . reasonably assign reduced moral blame to less serious defects . . . such . . . as . . . discolored drain stoppers, and inoperable garbage disposals.” (Maj. opn., ante, at p. 647.) Indeed, as explained below, I believe that we should distinguish between allowing recovery for correction of serious life- and property-endangering code violations, and repair of defects such as those just listed.

The record indicates that defendants may yet challenge plaintiffs’ claims based upon the statute of limitations.

In this regard, codefendant Lyon conceded at oral argument that “it is reasonable to assume that the percentage [of Northridge earthquake homeowners] that did suffer damage probably included a lot of . . . homes that did not have compliance with the [prevailing] safety code[s].”

In the process, the majority rejects plaintiffs’ assertion that the cost of repairs is an “accepted measure of damage for construction defects and that plaintiffs could make the cost of repairs certain ... by voluntarily repairing defects and obtaining a receipt for money spent.” (Maj. opn., ante, at p. 646, italics added.) Although this point was expressly conceded by codefendant Branco Corporation at oral argument, the majority refuses to accept that concession, asserting simply that to do so would confuse “the measurement of alleged *671 damages with the ability of particular facts to support a tort action.” (Ibid.) Of course, reasonable certainty in both (i) the need to make repairs, and (ii) the amount of money required to accomplish repairs, must be proved. I view codefendant Branco Corporation’s concession as recognizing that, if a homeowner reasonably were to undertake and pay for repairs in order to avoid the risk posed by serious building safety code violations such as the shear wall and fire protection violations here at issue, a court should conclude with a high degree of certainty that the homeowner has suffered injury, and that the third Biakanja/J’Aire factor is met.

In this regard, I find helpful Morris v. Osmose Wood Preserving (1995) 340 Md. 519 [667 A.2d 624], in which the Maryland high court explained that its decisions in this area “reveal a two part approach to determine the degree of risk required to circumvent the economic loss rule. We examine both the nature of the damage threatened and the probability of damage *672 occurring to determine whether the two, viewed together, exhibit a clear, serious, and unreasonable risk of death or personal injury. Thus, if the possible injury is extraordinarily severe, [e.g.,] multiple deaths, we do not require the probability of the injury occurring to be as high as we would require if the injury threatened were less severe, [e.g.,] a broken leg or damage to property. Likewise, if the probability of the injury occurring is extraordinarily high, we do not require the injury to be as severe as we would if the probability of injury were lower.” (Id., at pp. 631-632, italics added.)
The majority hypothesizes that distinguishing between “serious" and “minor" defects would “in practice” prove to be difficult and would “likely . . . insulate from demurrer and summary judgment virtually all complaints containing allegations of building code violations.” (Maj. opn., ante, at pp. 650-651.) As noted above, such a distinction has been recognized for more than 14 years (Whiting-Turner, supra, 517 A.2d 336, 345, fh. 5), but the majority fails to cite any authority suggesting that such problems have occurred in practice.

As Justice Mosk explains in his separate dissent, and as codefendant Lyon argued in the alternative in the Court of Appeal, the theory advanced in Judge Posner’s opinion in Eljer Mfg., Inc. v. Liberty Mut. Ins. Co. (7th Cir. 1992) 972 F.2d 805, provides, by analogy, additional and separate support for recognition of a right to recover repair costs in the present case.

I italicize must because the word prefigures cautionary language in the Eljer opinion. The risk of harm—in Eljer, the “expected failure rate” (Eljer, supra, 972 F.2d at p. 812)—“must be sufficiently high ... to induce a rational owner to replace it” (ibid.) or repair it.

Eljer relied on Illinois law in interpreting the insurance policies. The Appellate Court of Illinois later rejected its interpretation. (Travelers Ins. Co. v. Eljer Mfg., Inc. (1999) 307 Ill.App.3d 872 [241 Ill.Dec. 178, 718 N.E.2d 1032, 1039-1041], review granted (1999) 186 Ill.2d 590 [243 Ill.Dec. 569, 723 N.E.2d 1170].) Leaving aside the policies’ definition of “property damage,” however, Eljer’s conclusion favoring the so-called incorporation doctrine—that property damage occurs when defective installation or construction requires that walls be tom out or the like—is persuasive and should be applied here.

Like the Chief Justice, I concur in the majority’s conclusion regarding trivial and nonhazardous alleged defects of the type to which the majority refer.